Joseph P. CONNORS, Sr., et al., Appellants,

v.

B & H TRUCKING COMPANY, INC.

Joseph P. CONNORS, Sr., et al.

v.

B & H TRUCKING COMPANY, INC., Appellant.

Nos. 87–7228, 88–7010.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1989.

Decided March 28, 1989.

Terrence M. Deneen, with whom David W. Allen, Baltimore, Md., William F. Hanrahan, Washington, D.C., and Lonie A. Hassel were on the brief, for appellants in No. 87–7228 and appellees in No. 88–7010.

Melody A. Simpson, Charleston, W.Va., for appellant in No. 88–7010 and for appellee in No. 87–7228.

John H. Korns also entered an appearance, for appellee in No. 87–7228.

Before STARR, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Plaintiffs are the Trustees of the United Mine Workers 1974 Pension Plan, in which defendant B & H Trucking Co. was a participating employer until its withdrawal in 1983. The Trustees appeal from an order of the district court affirming an arbitrator's determination that such withdrawal occurred in July rather than, as the Trustees assert, in June 1983. We reverse the order as the district court in this regard.

B & H cross-appeals from the same order insofar as it affirmed the arbitrator's determination that the employer had defaulted on its obligation to pay its "withdrawal liability" to the Plan. In this regard, we affirm.

## I. BACKGROUND

Under the Multiemployer Pension Plan Amendments Act of 1980, which amended the Employee Retirement Income Security Act of 1974, an employer withdrawing from a multiemployer plan must pay its proportionate share of the difference between the present value of the plan's vested benefits and the present value of its assets. The scheme works basically as follows: An employer is deemed to have withdrawn completely from a multiemployer plan, *inter alia*, when it "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a)(2). (All subsequent references to 29 U.S.C. are abbreviated to the section number thereof.) Such a withdrawal is deemed to have occurred on "the date of ... the cessation of covered operations." § 1383(e). The withdrawing employer is then assessed a "withdrawal liability," § 1381(a), the amount of which is computed on the basis of the plan's total unfunded vested benefits as of the end of the "plan year" preceding the year in which the employer withdrew. § 1391(c)(3). Generally, an employer's withdrawal liability is to be paid over time, under a complicated scheme providing for an appropriate amortization period, interest rate, etc. § 1399. Section 1399(c)(5) provides an exception to this general rule, however; if an employer defaults, the plan is entitled immediately to collect the entire amount of the withdrawal liability. The statute defines "default" to include, in addition to a 60–day delinquency on any payment due, "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." § 1399(c)(5).

A dispute over any of the provisions surveyed above is subject in the first instance to arbitration. § 1401(a)(1). The arbitrator's award is subject to judicial review, § 1401(b)(2), but in court, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." § 1401(c).

## II. FACTS

B & H, a closely-held West Virginia corporation in the business of transporting coal, was a signatory to successive collective bargaining agreements with the United Mine Workers of America calling for monthly reports to the Trustees and contributions to the Plan. From November 1982 through May 31, 1983, however, B & H found itself without any covered work. Accordingly, it did not submit monthly reports or make contributions for that period.

In June 1983, the Trustees wrote to the employer asking why it had not reported "for some time for work performed under [its agreement with the UMWA]." B & H promptly replied that it had not had any covered work from November through May, but advised that it had "resumed work June 1, 1983, and worked through June 15, 1983." Due to the state of the economy, however, it said that it had stopped work on the 15th and that "there is no work at all for any of our employees in the foreseeable future." On April 12 of the next year, the Trustees notified the employer that they had "determined that, as a result of the permanent cessation of

all covered operations under the Plan, B & H ... withdrew from the Plan on or about June 1983." Accordingly, the Trustees' letter was "a formal Notice and Demand for payment of ... withdrawal liability" of just over $88,000, payable, at the employer's option, either in a lump sum or in 28 monthly installments including interest.

In the interim between June 15, 1983, and receipt of the Trustees' April letter, B & H did no covered work, although it did for a while bid on jobs that would have required it to make contributions to the Plan had it obtained the work. Finally, on November 16, 1984, B & H's shareholders adopted a plan of complete dissolution pursuant to which B & H would retain $125,000 to cover its known liabilities, and the remainder of its assets and liabilities would be assigned to the shareholders. B & H then informed the Plan of its anticipated dissolution.

On December 13, the Trustees notified B & H that, under the Plan's rule defining events of default, B & H had defaulted on its withdrawal liability payments by initiating its own dissolution and that the entire amount of the withdrawal liability was therefore due and owing. The Plan also notified B & H that, due to an error in its initial computation, the Plan had understated B & H's withdrawal liability and that the correct figure was just over $100,000. B & H made a timely demand for arbitration. (Apparently in order to preserve its right to claim in the arbitration proceeding that it was not in default of its withdrawal liability, on January 31, 1985, B & H presented to the Plan a check in full payment of its then past due installments of withdrawal liability.)

Three questions were submitted to the arbitrator: (1) Had B & H "completely withdrawn" from the Plan? (2) If so, what was "the date of such withdrawal?" and (3) Was B & H in default of its withdrawal liability (by reason of its dissolution)? In August 1985, the arbitrator decided that B & H had completely withdrawn from the Plan, that "the date on which [the employer] withdrew ... was during July 1983," and that B & H was in default of its

withdrawal liability. The consequence of the arbitrator's determination that B & H had withdrawn in July, rather than in June as the Trustees had determined, was to decrease the employer's withdrawal liability to $53,000. The difference of one calendar month made June 30, 1983, rather than June 30, 1982, the relevant date under the Act, § 1391(c)(3), as of which to calculate the employer's share of the Plan's unfunded vested benefits. Since B & H was in default, however, the arbitrator ordered B & H immediately to pay the full amount of its recalculated withdrawal liability.

The Trustees filed this action in district court to challenge the arbitrator's determination of the date of withdrawal and to enforce his order to pay. The district court, consistent with a magistrate's recommendation, affirmed the arbitrator's award in all respects. The Trustees appeal regarding the date of withdrawal, and B & H cross-appeals regarding the determination that it was in default, but B & H does not challenge the court's determination that it had completely withdrawn from the Plan.

### III. ANALYSIS

The questions before us are thus (1) the date of B & H's complete withdrawal from the Plan; and (2) whether B & H defaulted on its payment obligations by adopting a plan of dissolution.

#### A. *The Date of B & H's Withdrawal*

■ The parties devote a great deal of energy to the question of the appropriate standard of review. B & H contends that the question of the date of withdrawal is a question of fact and that the district court was therefore required to indulge the arbitrator in "a presumption, rebuttable only by a clear preponderance of the evidence," that his answer to the question was correct. The Trustees argue, on the other hand, that the question is one of law and that the statutory presumption is therefore not applicable here. We need not decide that question, however, for we conclude that, even assuming that the presumption of correctness applies, the Trustees rebut-

ted it by a "clear preponderance of the evidence" before the district court and that the court therefore erred as a matter of law in upholding the arbitrator's determination.

The arbitrator found that "B & H Trucking's last operation covered by the 1974 Plan occurred on June 15, 1983." B & H does not dispute the accuracy of this finding. The arbitrator also concluded that in the "unique circumstances of this case," the Plan's determination that B & H's complete withdrawal occurred in June 1983 was "unreasonable." In so concluding, the arbitrator clearly erred, and the district court similarly erred in upholding him.

B & H's primary argument in support of the ruling under review is that the relevant time for the purpose of determining when B & H ceased covered operations is not the day on which it last had covered operations but the month in which covered operations ceased. B & H supports this contention with the claim that the collective bargaining agreement required monthly reporting and contributions and that the Trustees' determination of the date of withdrawal was phrased in terms of a month ("on or about June 1983") rather than a particular day. Because B & H filed its last report, covering its June activities, in July 1983, and because July was the first month in which it performed no covered work, B & H argues that July is the month in which it ceased operations.

There are two difficulties with this approach. The most obvious is that the statute refers to the "date" of the cessation of operations. Common usage is that the date on which something happens is the day on which it happens. Even when discussing an event remote in time, when we say date, we mean day. When we ask on what date the Declaration of Independence was signed, we expect to be told July 4, 1776, not July 1776. There is no indication that by "date" Congress meant "month," any more than "week" or "year." Indeed, it is the Plan, not the statute, that provides for monthly reporting and remittance; the Plan could equally well have called for bimonthly or quarterly periods; the rele-

vant statutory term for fixing the time of an employer's withdrawal would still be the "date" on which covered operations ceased.

The second problem with B & H's theory is that even if we were to interpret "date" to mean "month," the statute would still provide that withdrawal occurred during "the [month] of the cessation of covered operations," and that would still be June. B & H argues that "it cannot have *ceased* operations until July, 1983, the first month in which it performed no covered operations." Such a suggestion is, if not a complete *non sequitur*, at least counterintuitive. If a person died on June 15, it would be incorrect to say that the month in which he ceased breathing was July, because July was the first month in which he drew no breath.

B & H seeks to avoid the obvious reading of the statute by pointing to three cases in which a pension plan determined that an employer's obligation to contribute to the plan ceased on the first day of the month following the last month in which the employer had an obligation to contribute. As B & H admits, however, none of these cases is "precisely on point." Indeed, none involved a dispute over when covered operations—as opposed to the obligation to make contributions—ceased; in only one of the cited cases did the court even reach the question of the date of cessation at all, and that case involved the question whether the employer's bargaining to impasse with the union marked the cessation of its contribution obligation. *See Cuyamaca Meats v. Pension Trust Fund*, 827 F.2d 491, 499–500 (9th Cir.1987). *See also Robbins v. Braver Lumber and Supply Co.*, No. 85-C-08332, slip op. at 10–11, 1987 WL 18557 (N.D.Ill. October 14, 1987); and *Sheet Metal Workers Pension Fund v. Advanced Metal and Welding*, 643 F.Supp. 1201, 1208 (N.D.Ga.1986).

We therefore conclude that B & H's attempt to justify the arbitrator's ruling is unavailing and that the district court erred as a matter of law in affirming the arbitrator as to the date of withdrawal.

### B. *B & H's Default of its Withdrawal Liability*

■ The term of the Plan defining default provides that it includes

*the filing or commencement by the employer,* or the filing or commencement against the employer or any of its property, *of any proceeding,* suit or action, at law or in equity, *under or relating to any* bankruptcy, reorganization, arrangement-of-debt, receivership, liquidation, or *dissolution law* or statute or amendments thereto....

(Emphasis added.) The Trustees notified B & H that, in their view, it had defaulted on its withdrawal liability by initiating dissolution proceedings.

B & H disputes the Trustees' determination on the ground that the Plan's definition of default is overbroad; the Plan defines default to include dissolution proceedings regardless of whether the company has made adequate provision in its plan of dissolution for the payment of its withdrawal liability. The employer argues that because it cannot be said that there is a "substantial likelihood that [such] an employer will be unable to pay its withdrawal liability," § 1399(c)(5)(B), the Plan's definition of default is inconsistent with the authorizing section of the statute.

It seems clear, however, that the definition of default in the Plan was a reasonable description of a "substantial likelihood" that an employer will be unable to meet its withdrawal obligations. To require, as would B & H, that the Trustees determine whether a particular employer's plan of dissolution adequately protects the Plan's interest in full receipt of the withdrawal liability due it would require the Trustees to examine each employer's plan of dissolution in order to ensure that the employer had established a segregated fund sufficient to meet the liability, that the fund was adequately secure against other claims, etc. We have found nothing that leads us to conclude that Congress intended to require that plans make such particularized inquiries in order to protect themselves from a substantial likelihood of nonpayment.

We note also that in the Federal Register notice accompanying the promulgation of the Pension Benefit Guaranty Corporation's regulation on Notice and Collection of Withdrawal Liability, 29 C.F.R. § 2644, the agency gave as an example of an event evincing a "substantial likelihood" of inability to pay that "an employer ... begins liquidating all of its assets...." 49 Fed. Reg. 22,642, 22,644 (1984). The initiation of dissolution proceedings is just that. B & H's attempt to characterize its dissolution proceedings as involving a liquidation of fewer than "all" of its assets because B & H retained some assets to pay known liabilities is based on a misunderstanding of the phrase "liquidating all of its assets." The relevant distinction is not between liquidations in which the company retains some assets to pay liabilities and those in which it does not. In fact, a company in liquidation typically retains some assets for precisely that purpose. Rather, the distinction is between complete liquidations, in which the entire company is dissolved, and partial ones, in which the company retains its corporate identity but distributes certain assets, usually associated with one or more discrete lines of business, to its shareholders or to another corporation owned by its shareholders. B & H's dissolution is clearly of the former type.

Moreover, 29 C.F.R. § 2644.4 provides that a plan *may* consider a particular employer's credit worthiness in determining whether the employer has defaulted, but does not require the plan to consider that factor. The regulation thus contemplates that there may be certain cases in which a creditworthy employer is deemed to have defaulted. B & H's suggestion that any overbreadth is by nature fatal is therefore flatly inconsistent with the relevant regulation, a source of expertise on which we draw but by no means depend in holding that the Plan is not *ultra vires* the authority granted by the statute.

### IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded

for the entry of judgment consistent with this opinion.

Because we have resolved both the appeal and the cross-appeal against B & H, its request for attorneys fees is denied.

*So Ordered.*