# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 25, 2021          Decided July 8, 2022

No. 20-7054

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN, ET
AL.,
APPELLEES

v.

ENERGY WEST MINING COMPANY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01905)

———

*Yaakov M. Roth* argued the cause for appellant. With him
on the briefs were *Sherif Girgis*, *Gregory J. Ossi*, *Mark H.M.
Sosnowsky*, and *Christopher R. Williams.*

*Bryan Killian* argued the cause for appellee. With him on
the brief were *John R. Mooney*, *Paul A. Green*, *Olga M. Thall*,
and *Stanley F. Lechner. Charles P. Groppe* entered an
appearance.

Before: RAO and WALKER, *Circuit Judges*, and SENTELLE,
*Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* R<small>AO</small>.

R<small>AO</small>, *Circuit Judge*: The Multiemployer Pension Plan Amendments Act ("MPPAA") requires an employer to pay "withdrawal liability" if it decides to leave a multiemployer pension plan. Calculating the amount of money the employer owes the plan requires an actuary to project the plan's future payments to pensioners. As with any financial projection, this requires making assumptions about the future. The MPPAA requires the actuary to use "assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1).

The Energy West Mining Company ("Energy West") withdrew from the United Mine Workers of America 1974 Pension Plan ("Pension Plan") in 2015. In calculating Energy West's withdrawal liability, the actuary did not rely on the Pension Plan's performance to determine what discount rate to use, but instead adopted a risk-free discount rate. An arbitrator upheld the risk-free discount rate and the district court granted summary judgment to the Pension Plan, enforcing the arbitral award. We reverse because the actuary's choice of a risk-free rate violates the MPPAA's command to use assumptions that are "the actuary's best estimate of anticipated experience under the plan."

I.

A.

To ensure that employees who were promised a pension would actually receive it, Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1001(a); *Pension Benefit Guar. Corp. v. R. A. Gray &*

*Co.*, 467 U.S. 717, 720 (1984); *see generally* Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001 *et seq.* and in scattered sections of the Internal Revenue Code). By the late 1970s, it had become clear that ERISA was failing to stabilize multiemployer pension plans—those maintained pursuant to a collective bargaining agreement between multiple employers and a union.[1] *R. A. Gray*, 467 U.S. at 721–22; *see also* 29 U.S.C. § 1002(37)(A) (defining multiemployer plan). Like single employer plans, multiemployer plans had to meet minimum funding standards, which require employers to contribute annually to the plan whatever is needed to ensure it has enough assets to pay for the employees' vested pension benefits when they retire. *See Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). Unlike employers managing a single employer plan, however, employers in multiemployer plans could withdraw without triggering the plan-termination provisions of ERISA and thereby avoiding obligations to make ongoing contributions.[2]

If a multiemployer plan was financially stable, then ERISA worked. But if a plan became financially troubled, large contributions would be needed to meet minimum funding standards, incentivizing employers to withdraw and

---

[1] Multiemployer plans are used mostly in industries where there are hundreds or thousands of small employers going in and out of business and where the nexus of the employment relationship is the union that represents employees who typically work for many of those employers over the course of their career. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 606 (1993).

[2] If an employer withdrew from a plan, the benefits its employees earned while the employer was part of the plan would remain on the plan's books.

precipitating a death spiral for the plan. *See id.* at 416–17. Every employer withdrawal would shrink a plan's contribution base, forcing the remaining employers to make even larger contributions and increasing their incentive to withdraw. ERISA's only check on this incentive was that if a plan terminated within five years of an employer's withdrawal, that employer would be liable for its share of the unfunded vested benefits. 29 U.S.C. § 1364 (1976); *Milwaukee Brewery Workers' Pension Plan*, 513 U.S at 416. Despite this risk, however, employers chose to withdraw, causing "a significant number of [multiemployer] plans" to experience "extreme financial hardship." *R. A. Gray*, 467 U.S. at 721.

In response, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, 94 Stat. 1208. The MPPAA "transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty" by requiring employers to pay "a withdrawal charge" upon their complete or partial withdrawal from a plan. *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417; *see* 29 U.S.C. § 1381(a). Specifically, a withdrawing employer must pay the plan its proportional share of the plan's "unfunded vested benefits," 29 U.S.C. § 1381(b)(1), which is "the difference between the present value of the plan's vested benefits and the present value of its assets," *Connors v. B & H Trucking Co.*, 871 F.2d 132, 133 (D.C. Cir. 1989); *see* 29 U.S.C. § 1393(c) (laying out this calculation).

An actuary must make numerous assumptions to calculate an employer's withdrawal liability. For example, to project the plan's vested benefits, the actuary must make assumptions about how long employees will work and how long retirees will live. The actuary also must make an assumption about the discount rate, i.e., the rate at which the plan's assets will earn

interest.[3] The discount rate is the weightiest assumption in the overall withdrawal liability calculation. *See Combs v. Classic Coal Corp.*, 931 F.2d 96, 101 (D.C. Cir. 1991) (explaining that an "erroneously low" discount rate, without appropriate offsetting assumptions, might "destroy the validity of the entire calculation" of unfunded vested benefits).

In the absence of a relevant regulation, an actuary must calculate withdrawal liability using assumptions "which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1); *see also id.* § 1393(a)(2) (allowing the use of assumptions set forth in Pension Benefit Guaranty Corporation ("PBGC") regulations).

ERISA and the MPPAA lay out a system to adjudicate disputes over withdrawal liability. The pension plan is responsible for initially determining an employer's withdrawal liability. *Id.* § 1382(1). If an employer wants to contest the plan's determination, it must first do so through arbitration. *Id.* § 1401(a)(1). In those and all subsequent proceedings, a plan's determination of unfunded vested benefits "is presumed correct unless a party contesting the determination shows by a preponderance of the evidence that" either "(i) the actuarial assumptions and methods used in the determination were, in

---

[3] Because of the time value of money, a plan does not need to have $100,000 on hand in order to pay $100,000 in the future. The money the plan has on hand will be invested and earn interest; how much interest the assets will earn determines how much the plan must have on hand at the time the employer withdraws. The discount rate is the amount of interest the actuary assumes the plan's assets will earn, which is used to convert the stream of future payments to employees into the present-day amount of assets needed to make those payments.

the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods." *Id.* § 1401(a)(3)(B). After arbitration, any party can seek "to enforce, vacate, or modify the arbitrator's award" in district court. *Id.* § 1401(b)(2). The court must apply a "presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." *Id.* § 1401(c).

## B.

The United Mine Workers of America 1974 Pension Plan is a multiemployer pension plan. Energy West was a participating employer in the Pension Plan but withdrew after closing its Utah mine in 2015. At the time of Energy West's withdrawal, the Pension Plan was projected to become insolvent as early as 2022. Needless to say, the Pension Plan had a lot of unfunded vested benefits, requiring Energy West to pay withdrawal liability.[4]

The job of calculating Energy West's withdrawal liability fell to William Ruschau, the Pension Plan's actuary. Ruschau testified that he used the Pension Plan's prior experience as a guidepost for most of his assumptions but that he did not consider the Pension Plan's historic investment performance to inform his discount rate assumption. Instead he "use[d] a reasonable risk-free interest rate," which is equivalent to assuming the plan would "buy[] an annuity to settle up the

---

[4] The Pension Plan's financial problems were mitigated greatly by the Bipartisan American Miners Act of 2019, but that infusion of money "shall be disregarded … for purposes of determining [an] employer's withdrawal liability." Pub. L. No. 116-94, div. M, § 102(a)(3), 133 Stat. 2534, 3092 (codified at 30 U.S.C. § 1232(i)(4)(E)).

employer's share of the unfunded vested benefits." His justification for using risk-free rates was that when an employer withdraws from a plan, it no longer bears any risk associated with that plan's investment performance.

The choice of a risk-free rate made a material difference. If Ruschau had used a discount rate assumption based on the Pension Plan's historic investment performance—around 7.5%—Energy West's withdrawal liability would have been about $40 million. *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 464 F. Supp. 3d 104, 111 (D.D.C. 2020). Instead, Ruschau used a discount rate assumption of 2.71% for 2015 to 2035 and 2.78% for all years thereafter, based on the rates the PBGC projected risk-free annuities will earn. *See id.* Applying that discount rate, Energy West's withdrawal liability was over $115 million. *See id.* at 120.

Energy West disagreed with the discount rate assumption and pursued arbitration.[5] It contended that the risk-free PBGC rate was an inappropriate choice for the discount rate assumption because (1) the actuary was required to "use the same or very similar rate for both withdrawal liability and [minimum] funding purposes," and (2) risk-free rates are not the "best estimate of anticipated experience under the plan" because they are not based on past or projected investment performance.

The arbitrator rejected both arguments. He agreed with the Pension Plan that using risk-free rates to calculate withdrawal

---

[5] Energy West also contended that ERISA's 20-year cap on withdrawal liability payments applied to it, but does not appeal the decisions of the arbitrator and the district court holding otherwise. *See id.* at 120–25.

liability was reasonable, even though they were not used to calculate minimum funding, because withdrawal liability, unlike minimum funding, acts "as a settlement of the employer's obligations." In reaching this conclusion, the arbitrator placed great weight on Actuarial Standard of Practice 27, Section 3.9(b), which states that "[a]n actuary measuring a plan's present value of benefits on a … settlement basis may use a discount rate implicit in annuity prices or other … settlement options." ACTUARIAL STANDARDS BOARD, ACTUARIAL STANDARD OF PRACTICE NO. 27: SELECTION OF ECONOMIC ASSUMPTIONS FOR MEASURING PENSION OBLIGATIONS § 3.9(b) (2013) ("ASOP 27"). The arbitrator read this section as approving the use of risk-free rates to calculate withdrawal liability on the theory that an employer's withdrawal constitutes a settlement. He concluded that "almost by definition an actuary who applies the guidance of the actuarial standards of practice is using a combination of methods and assumptions that would be acceptable to a reasonable actuary."

Before the district court, Energy West sought to vacate, and the Pension Plan sought to enforce, the arbitration award. The court granted summary judgment to the Pension Plan and entered an order enforcing the arbitration award. *See United Mine Workers of Am. 1974 Pension Plan*, 464 F. Supp. 3d at 125. The court rejected Energy West's contention that the discount rate assumptions for minimum funding obligations and withdrawal liability had to be identical under the MPPAA. Pointing to the statute's different language in the minimum funding section—requiring that "each" assumption be reasonable—and the withdrawal liability section—requiring that the assumptions be reasonable "in the aggregate"—the court held that different assumptions were permissible under the statute. *See id.* at 112–15. The court also rejected Energy West's contention that the use of risk-free rates was

unreasonable because it was not the "best estimate of anticipated experience under the plan." The court held that language meant only that the actuary must independently calculate withdrawal liability and that it did not impose any substantive requirements on the assumptions. *Id.* at 116–20. Energy West appealed.

## II.

We review the district court's grant of summary judgment de novo, which means, in essence, we are reviewing the arbitrator's decision. *Combs*, 931 F.2d at 99. The arbitrator's findings of fact are presumed correct unless they are rebutted "by a clear preponderance of the evidence," 29 U.S.C. § 1401(c), and the arbitrator's legal determinations are reviewed de novo, *see I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1207 n.7 (D.C. Cir. 1984).

## A.

When calculating withdrawal liability, the MPPAA mandates that actuaries use "assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). Energy West concedes that the "Aggregate Reasonableness Requirement" generally leaves the actuary with discretion to use his professional judgment about what assumptions are used to calculate withdrawal liability. The dispute here centers on whether the "Best Estimate Requirement" fetters that discretion. Energy West maintains that the Best Estimate Requirement mandates using assumptions based on the plan's particular characteristics. The Pension Plan, on the other hand, asserts that the Best Estimate Requirement requires that the

assumptions be developed independently by the actuary but otherwise imposes no substantive requirements on the assumptions made.

Energy West is correct that the actuary must make assumptions based on the plan's particular characteristics when calculating withdrawal liability. This follows directly from the words of the statute. The MPPAA specifies that the assumptions must be "the actuary's best estimate *of anticipated experience under the plan*." *Id.* (emphasis added). Congress directed what the actuary must estimate when making assumptions used to calculate withdrawal liability, namely a plan's anticipated future liabilities and asset returns. Such predictions necessarily turn on a plan's characteristics.

The district court interpreted the Best Estimate Requirement to require only that the assumptions be made by the actuary; however, such an interpretation disregards the requirement that the actuary estimate the "anticipated experience under the plan." *Id.* "It is our duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (cleaned up). To give effect to every word of the Best Estimate Requirement, we interpret it to lay down both a procedural rule that the assumptions be made by the actuary and a substantive rule that the assumptions reflect the characteristics of the plan.

As applied to the discount rate assumption, using the plan's particular characteristics means the actuary must estimate how much interest the plan's assets will earn based on their anticipated rate of return. An actuary cannot base the discount rate "on investments that the plan is not required to and might never buy, based on a set formula that is not tailored to the unique characteristics of the plan." *Sofco Erectors, Inc. v. Trustees of Ohio Operating Eng'rs Pension Fund*, 15 F.4th

407, 421 (6th Cir. 2021) (cleaned up). Thus, risk-free rates might be appropriate if a plan were invested in risk-free assets, or perhaps if it planned to invest the withdrawal liability payments in risk-free assets. But if the plan is currently and projects to be invested in riskier assets, the discount rate used to calculate withdrawal liability must reflect that fact.

This interpretation of the Best Estimate Requirement is reinforced by comparison to other sections of ERISA. Congress has tailored the calculation of liabilities, providing distinct actuarial specifications for different circumstances. For example, benefits must be paid "in the form of an annuity" upon the "[t]ermination of a multiemployer plan," which can occur when every employer withdraws from the plan. 29 U.S.C. § 1341a(a)(2), (c)(2). When a plan terminates, PBGC regulations require that actuaries use a proxy for risk-free rates to value employees' benefits. *See* 29 C.F.R. § 4281.13(a) (instructing actuaries to use the "interest assumptions" in the rate table for annuities). Similarly, ERISA directs actuaries to calculate minimum funding requirements "without taking into account the experience of the plan" when determining whether a plan has hit its full-funding limitation. 29 U.S.C. § 1084(c)(6)(E)(iii)(I). Such meaningful variation only bolsters the requirement to read the statute to mean what it says. When calculating withdrawal liability, actuaries must select a discount rate based on the plan's actual anticipated investment experience. *Accord Sofco Erectors*, 15 F.4th at 422.

Although the discount rate is only one of the assumptions used "in combination," 29 U.S.C. § 1393(a)(1), to calculate the withdrawal liability, it is the most impactful, *see Combs*, 931 F.2d at 101. Therefore, if the actuary selects a discount rate that is not the "best estimate of anticipated experience under the

plan," this error will usually render the calculation contrary to the MPPAA.

We find unpersuasive the Pension Plan's argument that the Best Estimate Requirement does not impose any substantive requirements on the assumptions but instead requires only that the assumptions come from the actuary. The Pension Plan relies on a series of out-of-circuit cases interpreting the Internal Revenue Code's then-identical Best Estimate Requirement.[6] But the cases the Pension Plan cites involved a distinct question about whether the Best Estimate Requirement meant that the actuary had to choose a single "best" estimate, or rather could choose within a "reasonable" range of estimates. Other circuits have concluded that the actuary may choose within a reasonable range, because if the Best Estimate Requirement meant an actuary had to pick the single point assumption that he thought was "the most likely result," then the requirement that the assumptions be "reasonable" would be "superfluous." *Vinson & Elkins v. Comm'r*, 7 F.3d 1235, 1238 (5th Cir. 1993); *see also Wachtell, Lipton, Rosen & Katz v. Comm'r*, 26 F.3d 291, 296 (2d Cir. 1994) (explaining the statute "is not violated when an actuary chooses an assumption that is within the range of reasonable assumptions, even when the assumption is at the conservative end of that range"); *Citrus Valley Ests., Inc. v. Comm'r*, 49 F.3d 1410, 1415 (9th Cir. 1995) (same); *Rhoades,*

---

[6] 26 U.S.C. § 412(c)(3) (1994) ("For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods … which, in the aggregate, are reasonable (taking into account the experiences of the plan and reasonable expectations), and … which, in combination, offer the actuary's best estimate of anticipated experience under the plan.").

13

*McKee & Boer v. United States*, 43 F.3d 1071, 1075 (6th Cir. 1995) (same).

The Pension Plan relies on the fact that, in reaching this holding, these circuits concluded the Best Estimate Requirement is "procedural," meaning that the estimate must be the actuary's alone. *See Citrus Valley*, 49 F.3d at 1414; *Rhoades*, 43 F.3d at 1075; *Wachtell*, 26 F.3d at 296; *Vinson & Elkins*, 7 F.3d at 1238. But these cases generally did not hold that the Best Estimate Requirement was *only* procedural. *See Wachtell*, 26 F.3d at 296 ("[T]he 'best estimate' requirement … is *principally* designed to [e]nsure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors.") (emphasis added); *Citrus Valley*, 49 F.3d at 1414 (quoting *Wachtell*); *Rhoades*, 43 F.3d at 1075 (same).

Rather, these cases analyzed only the first half of the Best Estimate Requirement—that the assumption be "the actuary's best estimate." As to the requirement that the assumptions be the "best estimate of anticipated experience under the plan," these courts were either silent, *see Vinson & Elkins*, 7 F.3d at 1237–39, or explicitly clarified that they were not reading it out of the statute, s*ee Wachtell*, 26 F.3d at 296 (the statute "is not violated when an actuary chooses an assumption that is within the range of reasonable assumptions, even when the assumption is at the conservative end of that range, *provided the chosen assumption is the actuary's best estimate of anticipated plan experience*.") (emphasis added); *Rhoades*, 43 F.3d at 1075 (quoting *Wachtell*).

Nothing in these cases forecloses requiring the actuary to use the plan's particular characteristics, which simply follows from the statutory requirement to determine the "best estimate of anticipated experience under the plan." Therefore, these

cases do not support the Pension Plan's argument that the Best Estimate Requirement does not mean what it says. *Accord Sofco Erectors*, 15 F.4th at 422 (holding that *Rhoades*, 43 F.3d at 1073–75, does not "suggest[] that actuaries may disregard the statute's requirement that they base their estimates on the 'anticipated experience under the plan'") (quoting 29 U.S.C. § 1393(a)(1)).

In sum, the MPPAA's rule that the actuary use assumptions "which, in combination, offer the actuary's best estimate of anticipated experience under the plan" requires the actuary to choose a discount rate assumption based on the plan's actual investments. 29 U.S.C. § 1393(a)(1). While there may be a reasonable range of estimates, the discount rate assumption cannot be divorced from the plan's anticipated investment returns.

The arbitrator found, and all agree, that the Pension Plan's actuary chose the risk-free PBGC rates based on the theory that risk-free rates are appropriate for withdrawal liability because the withdrawn employer no longer bears risk. The discount rate assumption was not chosen based on the Pension Plan's past or projected investment returns. Therefore, the PBGC rate assumption was not the actuary's "best estimate of anticipated experience under the plan."

## B.

The Pension Plan gives two reasons why the arbitration award should not be vacated even if Energy West's interpretation of the Best Estimate Requirement is correct. First, the Pension Plan asserts that using risk-free rates to calculate withdrawal liability is proper under ASOP 27,[7] and

---

[7] Specifically, the Pension Plan points to Section 3.9(b), which says to "use a discount rate implicit in annuity prices" when "measuring

that "[t]he Best Estimate Requirement does not override actuarial standards of practice." But the MPPAA, not ASOP 27, is the law. We also note that the standard actuarial practices recognize that legal requirements supersede any professional norms. *See* ASOP 27 § 1.2 ("If a conflict exists between this standard and applicable law (statutes, regulations, and other legally binding authority), the actuary should comply with applicable law."). In other words, an unlawful assumption violates professional norms and is therefore "unreasonable."[8] Whatever the merits of the actuary's theory, it cannot displace the Best Estimate Requirement.[9]

Second, the Pension Plan asserts that a violation of the Best Estimate Requirement is not a valid ground for vacating an arbitration award under the dispute resolution provision of the MPPAA. The statute specifies that "[i]n the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that ... the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking

a plan's present value of benefits on a defeasance or settlement basis." We express no opinion on the Pension Plan's argument that withdrawal liability is an occasion where benefits are properly measured on a "defeasance or settlement basis."

[8] This remains true regardless of how widespread the unlawful practice is among the profession. *Cf. The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (L. Hand., J.) ("[I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure[.]").

[9] Under the MPPAA, the only alternative to the Best Estimate Requirement for calculating withdrawal liability is a PBGC regulation prescribing actuarial assumptions and methods. 29 U.S.C. § 1393(a)(2). But there is no relevant regulation here.

into account the experience of the plan and reasonable expectations)." 29 U.S.C. § 1401(a)(3)(B). The Pension Plan contends that because the dispute resolution provision does not specify that the presumption of correctness can be overcome by showing that the assumptions were not the "best estimate of anticipated experience under the plan," such a showing cannot be grounds to vacate the arbitration.

We disagree. The dispute resolution provision permits vacating an arbitration award if the actuarial assumptions were unreasonable in the aggregate "taking into account the experience of the plan." *Id.* § 1401(a)(3)(B)(i). The Aggregate Reasonableness Requirement, both for dispute resolution and for withdrawal liability in Section 1393(a)(1), does not just require assumptions that are reasonable in the abstract; it requires assumptions that are reasonable relative to the plan, taking the plan's experience into account. If the actuary is not basing the assumptions on the plan's characteristics, the assumptions will not be reasonable "taking into account the experience of the plan." In other words, not only must the actuary's assumptions be reasonable, they must be aimed at the right calculation, namely the predicted future of the plan.

Here the discount rate assumption used to calculate unfunded vested benefits did not take into account the experience of the plan and therefore was not a reasonable assumption. Thus, Energy West raised a valid ground for vacating the arbitration award.

* * *

The arbitration award must be vacated because in determining the withdrawal liability for Energy West, the actuary failed to use a discount rate that reflected the Plan's

characteristics and was the "best estimate of anticipated experience under the plan."

## III.

Having decided that the arbitration award must be vacated, we nonetheless address Energy West's argument that the discount rate assumption used for withdrawal liability and minimum funding must be the same because a resolution of this question is relevant to the scope of acceptable calculations of Energy West's withdrawal liability. We hold that the assumptions need not be identical but must be similar because they both must be "the actuary's best estimate of anticipated experience under the plan."

The current provisions governing the assumptions for minimum funding and withdrawal liability are similar, but not identical. When the MPPAA was enacted, an identical rule applied to actuarial assumptions used to calculate a plan's minimum funding obligations and an employer's withdrawal liability. *Compare* 29 U.S.C. § 1082(c)(3) (1982), *with id.* § 1393(a)(1). In the Pension Protection Act of 2006, Congress tweaked the rule for calculating minimum funding obligations, but left the language regarding withdrawal liability assumptions unchanged. *See* Pub. L. No. 109-280, § 201, 120 Stat. 780, 862 (codified at 29 U.S.C. § 1084(c)(3)). This means that for withdrawal liability, actuaries must use "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). For minimum funding, on the other hand, actuaries must use "actuarial assumptions and methods—(A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and

(B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *Id.* § 1084(c)(3).

Both provisions require using assumptions that reflect "the actuary's best estimate of anticipated experience under the plan." For the reasons given above, this Best Estimate Requirement means that, for both calculations, the assumptions must be based on the actual characteristics of the plan. The discount rate specifically must reflect the interest the plan's assets are projected to earn. Because the discount rate assumptions for calculating withdrawal liability and minimum funding must be estimates of the same thing, they will invariably be similar. It is difficult, for example, to imagine they could diverge by nearly five hundred basis points, as they did here.

But it does not follow that the discount rates must be identical. The Best Estimate Requirement does not mandate adopting any single numerical assumption. As other circuits have held, there is an "acceptable range." *Citrus Valley*, 49 F.3d at 1415. And that must be so because if the Best Estimate Requirement forced actuaries to use the single most accurate estimation for each assumption, the requirement that the assumptions be reasonable would be "superfluous." *Vinson & Elkins*, 7 F.3d at 1238. Nothing in the statutory text indicates the assumptions for minimum funding and withdrawal liability must fall at the same point in the acceptable range of estimates based on the plan's characteristics. The assumed discount rates must be similar, even if not always the same.

This conclusion is supported by the somewhat different statutory language governing the assumptions for minimum funding and withdrawal liability. For withdrawal liability, actuaries must use assumptions "which, in the aggregate, are reasonable." 29 U.S.C. § 1393(a)(1). Because the assumptions

must be reasonable "in the aggregate," it may be possible for one unreasonable assumption to offset another, leading to an overall reasonable withdrawal liability calculation. *Combs*, 931 F.2d at 101.[10] For minimum funding, on the other hand, actuaries must use assumptions "each of which is reasonable." 29 U.S.C. § 1084(c)(3). Since "each" assumption must be reasonable, there is no possibility of offsetting assumptions for minimum funding calculations. Thus, the different statutory requirements suggest the possibility at least that different assumptions could be used for each calculation, so long as both assumptions are based on the plan's actual characteristics.

Energy West maintains that the Supreme Court held the assumptions used to calculate minimum funding and withdrawal liability must be identical in *Concrete Pipe*, 508 U.S. at 615–36. *Concrete Pipe*, however, did not so hold. In considering the constitutionality of a provision of the MPPAA, the Court explained that "[t]he statutory requirement (of actuarial assumptions and methods—which, in the aggregate, are reasonable) is not unique to the withdrawal liability context, for the statute employs identical language in" the minimum funding context. *Id.* at 632 (cleaned up). When *Concrete Pipe* was decided, the provisions for minimum funding and withdrawal liability were still identical. *Compare* 29 U.S.C. § 1082(c)(3) (1988), *with id.* § 1393(a)(1). As the Court explained, that identical language "tends to check the actuary's discretion" because "[u]sing different assumptions for different purposes could very well be attacked as presumptively

---

[10] Nothing in the record suggests, nor does any party contend, that there were offsetting assumptions in this case.

unreasonable both in arbitration and on judicial review." *Concrete Pipe*, 508 U.S. at 633 (cleaned up).

The Court's reasoning suggests that actuaries must typically use the same discount rate assumption. But the Court stopped short of holding that the statute required actuaries to use identical rates, even when the statutory provisions for withdrawal liability and minimum funding were identical. To hold that using different assumptions "could very well be attacked as presumptively unreasonable" is not to hold that that the assumptions must be the same as a matter of law. *Id.* (cleaned up); *see N.Y. Times Co. v. Newspaper & Mail Deliverers'—Publishers' Pension Fund*, 303 F. Supp. 3d 236, 254 (S.D.N.Y. 2018). Moreover, even if *Concrete Pipe* had held the assumptions must be identical, after the 2006 amendment to the minimum funding provision that holding may no longer be good law. *See Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 389–90 (D.N.J. 2018).

Our holding that the discount rates used to calculate minimum funding and withdrawal liability must be *similar* accords perfectly with *Concrete Pipe*, because both rates must be the actuary's "best estimate of anticipated experience under the plan."

\* \* \*

To calculate Energy West's withdrawal liability from the Pension Plan, the actuary was required to base his assumptions on the Plan's actual characteristics. Because the actuary failed to do so, we reverse the judgment of the district court and remand for vacatur of the arbitration award. When the actuary calculates Energy West's withdrawal liability, the discount rate

assumption must be similar, but need not be identical, to the discount rate assumption used to calculate minimum funding.

*So ordered.*